**United States Court of Appeals**
**Fifth Circuit**
**F I L E D**
**October 18, 2005**
Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 03-20787
c/w 04-20861
c/w 05-20049

TEST MASTERS EDUCATIONAL SERVICES INC; VIVEK ISRANI

      Plaintiffs - Appellees

  v.

ROBIN SINGH, doing business as Testmasters

      Defendant - Appellant

------------------------------------------------------------------

ROBIN SINGH EDUCATIONAL SERVICES INC, a California Corporation, doing business as Testmasters

      Plaintiff - Appellant-Cross-Appellee

  v.

TEST MASTERS EDUCATIONAL SERVICES INC, a Texas Corporation

      Defendant - Appellee-Cross-Appellant

VIVEK ISRANI

      Defendant - Appellee

--------------------------------------------------------

TEST MASTERS EDUCATIONAL SERVICES INC

      Plaintiff - Appellee-Cross-Appellant

VIVEK ISRANI

      Plaintiff - Appellee

v.

ROBIN SINGH

> Defendant - Appellant-Cross-Appellee

-------------------------------------------------------------

TEST MASTERS EDUCATIONAL SERVICES INC

> Plaintiff - Appellant

v.

ROBIN SINGH, doing business as Testmasters

> Defendant - Appellee

------------------------------------------------------

ROBIN SINGH, doing business as Testmasters

> Plaintiff - Appellee

v.

TEST MASTERS EDUCATIONAL SERVICES INC; ET AL

> Defendants

TEST MASTERS EDUCATIONAL SERVICES INC

> Defendant - Appellant

------------------------------------------------------

ROBIN SINGH EDUCATIONAL SERVICES INC, a California Corporation, doing business as Testmasters

> Plaintiff - Appellee

v.

TEST MASTERS EDUCATIONAL SERVICES INC, a Texas Corporation

> Defendant - Appellant

Before GARWOOD, JONES, and STEWART, Circuit Judges.

CARL E. STEWART, Circuit Judge:

The principal issue in this case is whether Robin Singh is estopped by res judicata from asserting his claims of unfair competition, false designation of origin, and deceptive advertising pursuant to 15 U.S.C. § 1125(a)(1)(A); false advertising pursuant to 15 U.S.C. § 1125(a)(1)(B); and infringement of a registered trademark under California law. The district court held that a prior action and final judgment on the merits between these parties barred this litigation. Singh also challenges the district court's permanent injunction order. For the following reasons, we affirm in part, vacate in part, and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

As the district court in California so aptly stated, "[t]his is the second coming of the Hatfields versus the McCoys." *Robin Singh Educ. Servs., Inc. v. Test Masters Educ. Servs.,Inc.*, No. CV 03-04436 PA (C.D. Cal. Aug. 15, 2003). The parties seem to share a mutual animosity, as evidenced by their litigious history.[1] Their problems stem from the fact that Appellant Robin Singh ("Singh")

---

[1] *See Test Masters Educ. Servs., Inc. v. Singh*, 2002 WL 1940083 (5th Cir. 2002); *Robin Singh Educ. Servs., Inc. v. Excel Test Prep Co.*, Docket No. 03-5039-JSW (N.D. Cal.) (litigation between Singh and a company owned by Vivek Israni's sister); *Beck, et al. v. Test Masters Educ. Servs., Inc.*, Docket NO. 1:04-CV-1391 (D.D.C.) (a lawsuit filed by students, but funded by Singh, asserting consumer confusion due to TES's use of the mark "Testmasters").

and Appellee Test Masters Educational Services, Inc. ("TES") both operate test preparation companies under the name "Testmasters"or "Test Masters." Singh began doing business as "Testmasters" in Beverly Hills in 1991, offering test preparation classes exclusively for the LSAT. He only offered classes in California until 1996, when he began to expand nationally. TES began operations in 1992, offering test preparation for the SAT, GMAT, MCAT, and other standardized tests and professional licensing exams. Appellee Vivek Israni is the owner and president of TES. Until 2002, TES offered classes mostly in Houston, Texas, though sometimes in other cities in the state, but it did not operate outside of Texas. Curiously, despite the ongoing controversy between these two companies, TES has begun to provide LSAT classes outside of Texas under the "Test Masters" name. To add to the ongoing confusion, Singh has begun to offer test preparation classes for the SAT, GRE and GMAT.

The dispute between these parties centers around whether the "TESTMASTERS" mark is a valid trademark that can be federally registered. "In order to be registered as a trademark, a mark must be capable of distinguishing the applicant's goods from those of others," or stated another way, a mark must be distinctive. *Sugar Busters, LLC v. Brennan*, 177 F.3d 258, 267-68 (5th Cir. 1999) (citations omitted). A distinctive mark identifies the source of the manufacturer to the buying public. *Id.* A mark is *inherently* distinctive if by its intrinsic nature the mark serves to identify the particular source of a product. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992). Examples are Judge Henry Friendly's often cited description of inherently distinctive marks as being either "arbitrary" ("Camel" cigarettes), "fanciful" ("Kodak" film), or "suggestive" ("Tide" laundry detergent). *Id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 10-11 (2d Cir. 1976)). The holder of a distinctive mark is entitled to trademark protection and can enjoin the use

4

of similar marks that might cause confusion in the market. *Id.*; *see also* 15 U.S.C. § 1114(1)(a).

Descriptive marks are marks that denote "a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir. 1983) (citations omitted). Because descriptive marks do not inherently identify a source, they cannot be protected unless they acquire distinctiveness through secondary meaning. *Id.* The "likelihood of confusion" is the basic test for both common-law and federal statutory trademark infringement. 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1 (4th ed. 1992) [hereinafter *McCarthy*]. A descriptive mark must develop secondary meaning to be afforded trademark protection because, without an association between the mark and a seller in the minds of buyers, its use by multiple sellers is not likely to cause confusion. *See* 2 *McCarthy* § 15:11. A descriptive mark can become distinctive if over time "it has developed secondary meaning, which occurs when, 'in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself.'" *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 211 (2000) (quoting *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851, n. 11 (1982)).

Registration is *prima facie* proof that the registered mark is distinctive. *Vision Ctr. v. Opticks, Inc.*, 596 F.2d 111, 119 (5th Cir. 1979). However, this presumption can be overcome by showing that the mark is merely descriptive. *Id.* The burden then shifts to the registrant to prove that its mark has secondary meaning. *Id.* The burden is substantial and requires a high degree of proof. *Bank of Tex. v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir. 1984); *Sugar Busters*, 177 F.3d at 269.

A.      Original Litigation

Neither party knew of the other until 1999.  In March 1999, Singh received a trademark registration from the U.S. Patent and Trademark Office ("PTO") for the mark "TESTMASTERS." Subsequently, Singh tried to set up a website for his company only to learn that TES had acquired the rights to the domain name testmasters.com in October 1995.  Singh's attorney sent a demand letter to TES and threatened to sue it for violating Singh's trademark rights if it did not relinquish the rights to the domain name.  Instead, TES filed suit in the federal district court in Texas seeking a declaratory judgment of non-infringement, or in the alternative, a judgment that Singh's trademark was invalid because "TESTMASTERS" does not have a secondary meaning.  TES also claimed that Singh committed fraud on the PTO.  Singh brought a separate action against TES in the federal district court in California, alleging infringement and unfair competition under California law.  Singh's California suit was transferred to the district court in Texas and the two suits were consolidated.  The district court granted summary judgment to Singh on TES's fraud claim.  The remaining claims went to trial in February 2001.

After a five-day trial, the jury found that "TESTMASTERS" was a descriptive mark but it had acquired a secondary meaning.  The jury also found that TES had infringed the mark, but that TES was not subject to liability because it was an innocent prior user.  The jury concluded that TES had engaged in unfair competition in California because the domain name could cause confusion with Singh's TESTMASTERS mark.  The district court issued judgment for Singh on its unfair competition claim and ordered TES to transfer the website domain name to Singh.  The district court also ordered the director of the PTO to modify Singh's trademark registration to exclude Texas so that TES would have the exclusive right to use the mark within Texas.

6

Both parties appealed to this court. On July 24, 2002, we held that Singh failed to provide sufficient evidence to support a finding that his mark had acquired secondary meaning. *Test Masters Educ. Servs., Inc. v. Singh*, 2002 WL 1940083 (*Testmasters I*)(5th Cir. 2002) (unpublished). In support of his declaration that his mark had acquired secondary meaning, Singh introduced as evidence four "Testmasters" advertisements that appeared in the "Daily Bruin," the student newspaper of the University of California at Los Angeles. *Id.* at *3. The ads compared Singh's product to those of his competitors Kaplan and Princeton Review; two ads also contained testimonials from satisfied customers. *Id.* In addition, Singh testified that Kaplan and Princeton Review have referred to his company "hundreds of times" in their ads. *Id.* We noted that "the probative value of advertising in establishing secondary meaning depends on the presence of data regarding [the advertising medium's] reach, frequency, and duration." *Id.* at *4 (citing 2 *McCarthy* § 15:51). Singh did not provide any data regarding the circulation numbers for the Daily Bruin, and the evidence suggested that the ads themselves only ran four times. We held that four ad appearances in a newspaper that probably does not circulate beyond UCLA is insufficient to prove that, in the minds of the national public, the "TESTMASTERS" mark is associated with Singh's company. *Id.* Moreover, the testimonial evidence was insufficient because there were few in number. *Id.* Therefore, we found the ad evidence to be of little significance to the question of whether the "TESTMASTERS" mark had secondary meaning. We also observed that despite Singh's assertions, there was no actual evidence in the record that Kaplan and Princeton Review had referred to "Testmasters." *Id.*

We did find probative certain e-mails that TES received from potential customers who thought that TES was the California-based "Testmasters." *Id.* However, in view of Singh's overall

7

burden of proof, evidence of a couple of dozen e-mail messages that suggested customer confusion was not sufficient alone to demonstrate secondary meaning. *Id.* We stated that there were a number of types of potentially helpful evidence Singh could have produced but that were missing from the record including evidence of Singh's marketing and promotion, his sales and revenue, affidavits or testimony from customers and competitors, and, importantly, survey evidence. *Id.* Because Singh failed to show that a significant quantity of the consuming public associated the "TESTMASTERS" mark with his business, his evidence was insufficient to establish that the mark had acquired secondary meaning.

We reversed the district court's denial of TES's motion for judgment as a matter of law on the issue of secondary meaning. *Id.* at *5. We also vacated the judgment for Singh for unfair competition under California law, rendered judgment for TES instead, and vacated the order compelling TES to relinquish the disputed domain name. Finally, we remanded the action to the district court for entry of an order that Singh's trademark is invalid. *Id.*

On July 26, 2002, *two days* after our judgment, Singh filed a second trademark application to register "TESTMASTERS." TES submitted a Motion for Modification of Final Judgment and Permanent Injunction. On July 11, 2003, the district court granted TES's motion and entered an order permanently enjoining Singh from (1) pursuing registration of the "Testmasters" or "Test Masters" marks in the PTO; (2) interfering with or opposing TES's registration of the "Testmasters" or "Test Masters" marks with the PTO; (3) using the marks or any confusingly similar marks within Texas or directed at Texas, including but not limited to uses via the Internet. The district court also ordered the PTO to cancel Singh's federally-registered mark for "TESTMASTERS." No appeal was taken from this July 2003 order.

8

B.    Present Action

On June 23, 2003, Singh filed this second suit against TES in the federal district court in California, alleging unfair competition, false designation of origin, and deceptive advertising pursuant to 15 U.S.C. § 1125(a)(1)(A); false advertising pursuant to 15 U.S.C. § 1125(a)(1)(B); and infringement of a registered trademark under California law. This time Singh's cause of action centered around his contention that TES intentionally altered its website to suggest that it was Singh's California-based Testmasters LSAT preparation company. Singh requested that the district court enjoin TES from using the "TESTMASTERS" trademark outside of the state of Texas and enjoin TES from engaging in unfair competition, false designation of origin, false and deceptive advertising and infringement. Singh also requested that TES put a disclaimer on its website to clarify that Singh's "Testmasters" is not affiliated with TES. TES filed a motion to dismiss for res judicata. The California district court again transferred the case to the federal district court in Texas and dismissed without prejudice TES's original motion to dismiss for res judiciata. TES filed a renewed motion to dismiss for res judicata in the federal court in Texas and a motion to hold "Testmasters" and Singh in contempt for violation of the July 14, 2003 injunction order.

On September 16, 2004, the district court entered judgment for TES based on res judicata. *Robin Singh Educ. Servs, Inc. v. Test Master Educ. Servs, Inc.*, No. H-03-3348 (S.D. Tex. Sept. 16, 2004). The district court stated that the nucleus of operative facts in the prior action involved Singh's rights to the "TESTMASTERS" mark, TES's ownership of the testmasters.com domain name and website, and TES's use of the website to allegedly infringe upon Singh's trademark rights and to engage in unfair competition. In the current action, the district court averred that the nucleus of operative facts again involves Singh's alleged rights in the "TESTMASTERS" trademark, TES's

9

ownership of the testmasters.com domain name and website, and TES's use of the website to allegedly infringe upon Singh's trademark rights and to engage in unfair competition. The district court also stated that the transactions at issue in both cases involved TES's activity on the website. Because the district court concluded that both actions are based on the same nucleus of operative facts, the court held that the doctrine of res judicata bars this second action. The district court acknowledged that the factual scenario in the current action was indeed different than the factual scenario in the previous litigation. However, the district court concluded that that fact was "irrelevant to the res judicata analysis." Instead, the court stated that it was enough that "[t]he fact scenarios are [] parallel, for, in each case, Singh attacked TES for its use of the 'www.testmasters.com' website to infringe on Singh's trademark."

The district court also dismissed Singh's contention that Testmasters' drastic growth, nationwide exposure, and acquisition of state trademark rights in twenty-nine new states justifies re-litigating the secondary meaning issue. The district court observed that there has been no case in this circuit that has allowed re-litigation of secondary meaning after only sixteen months. However, neither has there been a case in this circuit, or any other, that has demarcated a precise amount of time that must pass before secondary meaning may be re-litigated. Nonetheless, the district court found no new issue of fact that would necessitate re-litigating the secondary meaning issue. Moreover, the court concluded that public policy should counsel in favor of barring further litigation related to the "TESTMASTERS" mark because of the onerous burden placed on the court and the parties in constantly re-litigating this matter. The district court noted that a descriptive mark must have secondary meaning to be afforded protection under the Lanham Act, thus, the court held that Singh's claims of unfair competition, false designation origin, deceptive advertising, and false

10

advertising must be dismissed because res judicata barred the re-litigation of the issue of secondary meaning. The district court also held that Singh's current claims could have been asserted in the prior action on appeal or as part of a Rule 60(b) motion.

TES's motion to hold Singh in contempt, and motion for sanctions, was denied and instead, the court issued another injunction order, which reiterated the prohibitions of the first injunction, but also enjoined Singh from "communicating directly with, threatening, or harassing Test Masters Educational Services, Inc., its employees, staff, counsel, counsel's employees, or counsel's staff." The injunction instructed Singh to withdraw his suspended trademark application pending before the PTO. Singh and TES both appealed.

## II. DISCUSSION

### A. The Res Judicata Effect of the Prior Litigation

The district court dismissed Singh's action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2]   Motions to dismiss are viewed with disfavor and are rarely granted. *Shipp v.*

---

[2] This case comes before us in a curious procedural posture. In the September 16, 2004 order, the district court converted TES's motion to dismiss to a motion for summary judgment and dismissed Singh's claim under the summary judgment standard. On October 3, 2004, the district court issued an amended order that supplanted its previous judgment. In the October 3rd judgment, the district court stated that it inappropriately converted TES's motion to dismiss to a motion for summary judgment. The court clarified that it was dismissing Singh's claims under the motion to dismiss standard not under the summary judgment standard. Singh offers a perfunctory argument that the district court's amended order contains improper references to the summary judgment standard and that the district court ignored allegations that it should have assumed were true. We disagree. The district court stated that it did not refer to documents outside of the pleadings in making its judgment. Even though a court permits affidavits and other evidence to be entered into the record, as long as the court does not base its judgment on matters outside of the pleading it may grant a dismissal pursuant to Rule 12(b)(6). *Davis v. Bayless*, 70 F.3d 367, 372 n.3 (5th Cir. 1995) (the presence of affidavits in the record does not convert the motion to dismiss to a motion for summary judgment); *see also Cinel v. Connick*, 15 F.3d 1338, 1343 n. 6 (5th Cir. 1994) ( federal courts are

11

*McMahon,* 199 F.3d 256, 260 (5th Cir. 2000). In deciding a motion to dismiss under Rule 12(b)(6), the district court accepts as true those well-pleaded factual allegations in the complaint. *C.C. Port, Ltd. v. Davis-Penn Mortgage Co.*, 61 F.3d 288, 289 (5th Cir. 1995). "Taking the facts alleged in the complaint as true, if it appears certain that the plaintiff cannot prove any set of facts that would entitle it to the relief it seeks," dismissal is proper. *Id.* It must appear beyond doubt that the plaintiff "can prove no set of facts in support of his claim which would entitle him to relief." *Campbell v. City of San Antonio*, 43 F.3d 973, 975 (5th Cir. 1995) (alterations and citations omitted).

The res judicata effect of a prior judgment is a question of law that this court reviews de novo. *See Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 546 (5th Cir. 2001).

The rule of res judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion. *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 436 (5th Cir. 2002) (internal citation omitted). Claim preclusion, or res judicata, bars the litigation of claims that either have been litigated or should have been raised in an earlier suit. *Petro-Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004) (quoting

---

permitted to refer to matters of public record when deciding a 12(b)(6) motion to dismiss); *Causey v. Sewell Cadillac-Chevrolet*, 394 F.3d 285, 288 (5th Cir. 2004) ( documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim). We do observe that generally a res judicata contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense. 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3rd ed. 2002). *But see Moch v. East Baton Rouge Parish School*, 548 F.2d 594, 596 n.3 (5th Cir. 1977) ("[I]f the trial court has treated the 12(b)(6) motion [based on res judicata] as one for summary judgment, its dismissal under 12(b)(6) is not reversible error." (citing *Larter& Sons, Inc. v. Dinkler Hotel Co.*, 199 F.2d 854, 855 (5th Cir. 1952))). However, Singh did not challenge TES's ability to argue res judicata in a motion to dismiss rather than in their response or a motion for summary judgment. *St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 445 (5th Cir. 2000) (arguments not raised are deemed abandoned). Therefore, we review the district court's dismissal of Singh's claims under the 12(b)(6) standard.

*In re Southmark Corp*., 163 F.3d 925, 934 (5th Cir. 1999)).  The test for res judicata has four elements: (1) the parties are identical or in privity; (2) the judgment in the prior action was rendered by a court of competent jurisdiction; (3) the prior action was concluded by a final judgment on the merits; and (4) the same claim or cause of action was involved in both actions.  *Id.* (citation omitted). In order to determine whether both suits involve the same cause of action, this Court uses the transactional test.  *Id.*  Under the transactional test, a prior judgment's preclusive effect extends to all rights of the plaintiff with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose.  *Id.* at 395-96 (quotation marks and citations omitted).  What grouping of facts constitutes a "transaction" or a "series of transactions" must be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.  *Id.* at 396 (quoting Restatement (Second) of Judgments  § 24(2) (1982)).  If a party can only win the suit by convincing the court that the prior judgment was in error, the second suit is barred.  *New York Life Insur. Co. v. Gillispie*, 203 F.3d 384, 387 (5th Cir.  2000).  The critical issue is whether the two actions are based on the "same nucleus of operative facts."  *Id.*; *see also Davis v. Dallas Area Rapid Transit*, 383 F.3d 309 (5th Cir. 2004).

Singh asserts that res judicata does not preclude this litigation because *Testmasters I* and the current action involve different operative facts.  He notes that all the claims at issue in this action arose from facts that occurred on or after May 2003, well after this court's judgment in *Testmasters I. See Blair v. City of Greenville*, 649 F.2d 365, 368 (5th Cir. Unit A July 1981) (prior judgment does not bar suit based on acts of the defendant that occurred after the final judgment); *Lawlor v.*

13

*Nat'l Screen Serv. Corp*, 349 U.S. 322, 327-28 (1955) (same). TES counters that Singh's present action is plainly foreclosed by res judicata because this action and *Test Masters I* are both based on Singh's claimed rights to the trademark "TESTMASTERS" and Singh's ability to preclude other confusing commercial uses. Moreover, TES argues that like the previous suit, Singh's present claims are related directly or indirectly to the content and/or operation of TES's testmasters.com website. *Testmasters I* resolved the issue of the ownership and use of the domain name testmasters.com in TES's favor, therefore, TES urges this court to find that Singh is barred from re-litigating the holding in *Testmasters I.*

The operative facts in the first action included: (1) Singh's use and registration of the "TESTMASTERS" trademark, (2) TES's use of the "Test Masters" mark and acquisition of rights to the testmasters.com domain name; and (3) Singh's demand that TES relinquish the testmasters.com domain name. Singh's current claims stem from his allegation that TES (1) posted statements on its website that it was "unfortunately" not holding classes in California thereby suggesting that TES had offered classes in California (TES has never done business in California, whereas California is Singh's main market); (2) falsely claimed that TES was offering classes in the markets outside of California where Testmasters was doing business; (3) created a phantom toll-free phone line for its LSAT classes; and (4) gave students inquiring about California LSAT courses the phone number of an unrelated software company called Testmasters. The district court acknowledged that there are distinctions between the factual scenario in this action and the prior action, however, the court stated that the distinctions are irrelevant. The district court relied on the fact that the "fact scenarios are certainly parallel" to find res judicata because in each case Singh attacked TES for its use of the testmasters.com website to infringe on Singh's trademark.

However, as we previously stated in *Petro-Hunt*, the district court's reliance on factual similarities to find res judicata is misplaced. *Petro-Hunt,* 365 F.3d at 396.

> [O]bservations of factual similarity, although potentially relevant for purposes of collateral estoppel, are not relevant to *res judicata*. Collateral estoppel prevents parties from re-litigating the same issues conclusively determined between them in a previous action. Although similar in principle, true *res judicata* is concerned with a sameness of operative facts.

*Id.* (holding that a ruling in an action to quiet title in one property does not have res judicata effect on another action that raises the same legal issues and involves a similar type of action against adjacent property). Although both actions involve potential customer confusion stemming from TES's website, the operative facts between the current litigation and the previous litigation are not the same. The current action does not involve the legitimacy of TES's use of the testmasters.com domain name, which was the central dispute in the previous litigation. Moreover, the nucleus of facts in the current action concerns allegations of intentional fraud and malice that did not occur at the time of the previous action. Singh's action is not estopped by res judicata or claim preclusion.

Although Singh may not be estopped under true res judicata, he still may be estopped under collateral estoppel. Collateral estoppel precludes a party from litigating an issue already raised in an earlier action between the same parties only if: (1) the issue at stake is identical to the one involved in the earlier action; (2) the issue was actually litigated in the prior action; and (3) the determination of the issue in the prior action was a necessary part of the judgment in that action. *Id.* at 397.

In *Testmasters I*, the critical issue before the court was whether the "TESTMASTERS" trademark had acquired secondary meaning. In the present case, Singh is requesting protection against unfair competition, infringement, and false and deceptive advertising, based on his central

15

argument that his "TESTMASTERS" mark has now acquired secondary meaning.[3]  The issues of law in both cases are incontrovertibly identical; nonetheless, Singh contends that collateral estoppel should not bar the current suit.  He relies on this circuit's decision in *Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684 (5th Cir. 1992), to argue that collateral estoppel should not bar a party from asserting in a subsequent litigation that a mark had acquired secondary meaning.

*Texas Pig Stands* involved litigation between two restaurant chains over the right to use the term "pig sandwich."  Texas Pig Sandwich (TPS) and Hard Rock Café both sold barbecued pig meat sandwiches at their respective restaurants under the term "pig sandwich."  *Id.* at 687.  TPS, who owned a registration for the term "pig sandwich,"  brought suit contending that Hard Rock infringed on TPS's rights to the "pig sandwich" term.  *Id.* at 688.  A jury found that Hard Rock was guilty of deliberate infringement of TPS's mark.  *Id.* at 689.  Hard Rock appealed, asserting that TPS was collaterally estopped from claiming that "pig sandwich" was a valid trademark.

Hard Rock based its collateral estoppel argument on a 1930 Texas state court decision involving Pig Stands, Inc, the predecessor of TPS and original holder of the registration for the "pig sandwich" mark.  *Id.* at 690.  In the late 1920s, Pig Stands brought suit against Dixiepig Corporation to enjoin them from using the "pig sandwich," "Dixiepig Sandwich," or similar terms because Pig Stands argued that the use infringed on their trademark.  *Id.* (citing *Dixiepig Corp. v. Pig Stand Co.,* 31 S.W.2d 325 (Tex. Civ. App. 1930)).  The state court in *Dixiepig* held that Pig Stands could not appropriate the words "pig sandwich" because Pig Stands had failed to present evidence that showed "pig sandwich" had acquired a secondary meaning.  *Id.*  Hard Rock argued that because Pig Stands

___

[3] We should clarify that Singh is asserting that his mark has acquired a secondary meaning *nationally*.  TES is asserting that this court found that it has rights to the mark within Texas and that Singh's mark has no secondary meaning.

16

could not appropriate the term "pig sandwich" in 1930, TPS cannot appropriate the term "pig sandwich" in 1990. *Id.*

We disagreed. The *Texas Pig Stands* court held that there was valid evidence for the jury to find that "pig sandwich" had acquired secondary meaning. *Id.* The court further stated that "*Dixiepig* arguably stands for the proposition that 'pig sandwich' is a descriptive term that did not have secondary meaning *at that time*. *Dixiepig*, therefore, would not finally determine Pig Stand's claim to ownership [of the trademark], because the term could eventually acquire a secondary meaning." *Id.* (emphasis added). *Texas Pig Stands* relied in part on this court's decision in *Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 862 (5th Cir. 1967), which held that in the interim between initiation of that action and a prior decision on the same question, the mark at issue had acquired secondary meaning because of "change in economic fact," which had created in the public mind an image of the mark as associated with its source.

TES counters that cases which have allowed the re-litigation of secondary meaning as a narrow exception to res judicata have only done so because secondary meaning had evolved over a *significant* period of time. In addition, TES argues that Singh's new evidence is simply evidence of an increased marketing campaign, and Singh should not be able to "spend his way out from under the original judgment."

The issue of whether res judicata bars re-litigating the issue of secondary meaning here is a difficult one. There are no cases which expressly demarcate a minimum time that must elapse before a defendant can re-litigate the issue of secondary meaning. *See Tex. Pig Stands*, 951 F.2d at 693; *see also Cont'l Motors Corp.*, 375 F.2d at 862; *Flowers Ind.,Inc. v. Interstate Brands Corp.*, 5

17

U.S.P.Q.2d 1580 (T.T.A.B. 1987); *In re Honeywell, Inc.*, 8 U.S.P.Q.2s 1600 (T.T.A.B. 1988).[4] On the other hand, we sympathize with the district court's assertion that public policy should counsel in favor of barring further litigation related to the "TESTMASTERS" mark because of the onerous burden placed on the court and the parties in constantly re-litigating this matter. It is well established that "'public policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties.'" *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 401 (1981) (citation omitted). The "doctrine of res judicata is not a mere matter of practice or procedure inherited from a more technical time than ours. It is a rule of fundamental and substantial justice, 'of public policy and of private peace,' which should be cordially regarded and enforced by the courts." *Id.* Moreover, we find it troubling that Singh chose to file another application for registration of the "TESTMASTERS" mark *two days* after this court ordered that the district court enter an order that Singh's trademark is invalid.

---

[4] The parties do not even agree on the time period that has elapsed between the prior finding of no secondary meaning and the initiation of this action. TES notes that only *two days* passed between this court's decision in *Testmasters I* and Singh's re-application for a federal trademark. TES also observes that the PTO canceled Singh's registration in March 2003 and that decision also has preclusive effect. TES contends that Singh's mark could not have developed a secondary meaning in the *three months* between March 2003 and the initiation of this suit in June 2003. Singh claims that the evidence of secondary meaning in the 2001 trial was limited to pre-1995 data because the question before the jury was whether the TESTMASTERS mark had acquired secondary meaning prior to TES's first use. He contends that he can establish that his mark has developed secondary meaning in the *ten years* since 1995. However, even if the court found that the first action was not limited to pre-1995 evidence, he asserts that he can establish that there has been such phenomenal growth in the TESTMASTERS mark in the *eighteen months* between the end of the jury trial and his second application for trademark registration that secondary meaning has developed in that short period of time.

We look again at this court's rulings in *Texas Pig Stands* and *Continental Motors* to determine whether re-litigation of secondary meaning is appropriate here. Upon close review of those opinions and the pleadings in this case, we conclude that our prior cases do not support allowing Singh to re-litigate his claim. The court in *Texas Pig Stands* based its holding, that collateral estoppel did not bar the action at issue, on the intervening factual changes that had occurred and that had altered the basis for the earlier judgment. *See* 95 F.2d at 691 (citing 1B J. Moore, J. Lucas & T. Currier, *Moore's Federal Practice* § 0.448 (1988)). Specifically, the court found:

> that over *sixty-five* years of proliferation of Pig Stands and 'The Sign of the Pig' throughout the country has led the consuming public automatically to associate the term 'pig sandwich' with TPS. While 'pig sandwich' may not have had a secondary meaning in 1930, a crucial decision of *Dixiepig* case, the jury finding to the contrary *sixty years* later affirms that a factual change has perhaps altered the basis upon which *Dixiepig* depended.

*Id.* at 691 (emphasis added). Similarly, the court in *Continental Motors* held that the passage of time had altered the basis for a prior decision that found that "Continental" did not have secondary meaning.

> That it is an 'old' case does not, of course, deprive it of force. But as with waters over the dam, there has been much trade in marks since it was announced. One thing, of course, is this dynamic developing field of law. More important, the continuing vitality of this pronouncement has been substantially, if not entirely, sapped by events of the business world. . . . Time, tide, and the relentless movement of the copywriter's pen makes what we once said no longer controlling, not so much from change in the law, but from change in economic fact. Not the least of these is the restless, undulating habits of our air-minded, air-traveling public, many of whom for sport, or pleasure, or business, or an areonautical [sic] combination of them, hop across the nation relying, as they must, on dependable service at airports small and large.

*Cont'l Motors*, 375 F.2d at 862. Neither opinion states that sixty years must pass before the issue of secondary meaning is ripe for re-litigation. However, it is clear from the text that collateral estoppel did not bar the claims at issue because after a significant amount of time had passed an

19

intervening factual change had occurred. For example, in *Continental Motors*, the court held that whether "Continental" could acquire secondary meaning was ripe for adjudication because in the sixty-seven years since the court's 1900 decision to the contrary,[5] the issue had been affected by the proliferation of commercial flight. We are not holding that a number of decades must pass before the issue of secondary meaning for a particular mark may be re-litigated or that the intervening factual change has to be something as significant as the proliferation of commercial flight. The case law has not developed, and we do not today decide, precise time contours for the re-litigation of secondary meaning. The determination of whether a mark has secondary meaning depends on dynamic factual scenarios that will necessarily vary from case to case. The thrust of our holding is that Singh has not alleged in his pleadings any significant intervening factual change. Singh's evidence of "dramatic" growth in his business and "skyrocket[ing]" revenues is not sufficient to justify re-litigation of the issue of secondary meaning in his mark.[6]

---

[5] *Cont'l Ins. Co. v. Cont'l Fire Ass'n*, 101 F. 255 (5th Cir. 1900).

[6] Our conclusion that *Texas Pig Stands* and *Continental Motors* do not support re-litigation of the issue of secondary meaning is bolstered by the fact that both cases involved third parties who were not parties to the original action; thus, both cases involved the application (or not) of *non-mutual* collateral estoppel. The instant case, however, involves the application of *mutual* collateral estoppel, which is subject to fewer and more narrow exceptions than non-mutual collateral estoppel. *Compare* Restatement (Second) of Judgments § 28 (listing five exceptions to the general rule of issue preclusion) *with* Restatement (Second) of Judgments § 29 (listing eight additional considerations where the subsequent litigation involves someone not party to the original suit).

We also observe that Singh has not sought relief from the judgment under Rule 60(b)(5) of the Federal Rules of Civil Procedure. *See generally Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378-382 (1992) (explaining that Rule 60(b)(5) allows a party to obtain relief from a final judgment where it is no longer equitable that the judgment apply prospectively). Because of our holding in part II of this opinion, we need not and do not determine whether avoidance of the prospective effects of mutual collateral estoppel in this context requires a party in Singh's position to proceed under Rule 60(b)(5). Moreover, Singh's allegations in his new suit do not state a basis for such relief.

20

At present, Singh's "TESTMASTERS" mark is more similar to the "pig sandwich" term in *Dixiepig* than the same "pig sandwich" that was found to have secondary meaning in *Texas Pig Stands*. The court in *Texas Pig Stands* observed that at the time of the *Dixiepig* litigation, the Pig Stand restaurants had only been in inception for a couple of years– although the court also stated that in its early years the Pig Stand restaurants enjoyed considerable success, opening up 100 restaurants across the country. 951 F.2d at 688. Despite the success of the "pig sandwich" it had not yet achieved a secondary meaning in the minds of the relevant public. Years later all but nine restaurants had closed. *Id.* at 688 n.3. The fact that the restaurant chain no longer enjoyed the significant success of its early years was irrelevant because the critical question was "'the primary significance of the term in the minds of the consuming public' *of the relevant geographical market*." *Id.* at 692-93 (emphasis added). Over the course of sixty years, the consuming public in the relevant geographic market had come to "automatically" associate "pig sandwich" with the Pig Stand restaurants. *Id.*

Here, although Singh has presented evidence that his Testmasters company has become more successful since the prior judgment, that success is not dispositive of the question of secondary meaning. He has alleged no set of facts that would suggest that there has been a change in the minds of the public in the relevant geographic area[7] such that they could immediately associate the "TESTMASTERS" mark with his test preparation corporation. Because he has not alleged a significant intervening factual change, we find that our previous holding bars Singh's current claim.

---

[7] Here, the relevant geographic area is the entire nation since he is alleging that his TESTMASTERS mark has acquired secondary meaning nationwide, and not just in his primary market of California. Thus, to acquire secondary meaning he would have to show that the American public would associate the "TESTMASTERS" mark with his company, a substantial burden of proof indeed.

Singh's common law and federal statutory claims for trademark protection are fatally intermixed with the issue of secondary meaning. *See Wal-Mart Stores*, 529 U.S. at 211; 2 *McCarthy* §§ 15:11 and 23:1. Because we have previously held that Singh's mark has no secondary meaning, the district court was correct in granting TES's motion to dismiss Singh's federal statutory and state common-law infringement claims.[8]

B.    The Permanent Injunction

Singh also appeals from the district court's permanent injunction order issued on September 17, 2004. We review the district court's grant or denial of a permanent injunction for abuse of discretion. *Peaches Entm't Corp. v. Entm't Repertoire Assoc.,* 62 F.3d 690, 693 (5th Cir. 1995). The trial court abuses its discretion if it: (1) relies on clearly erroneous factual findings when deciding to grant or deny the permanent injunction, (2) relies on erroneous conclusions of law when deciding to grant or deny the permanent injunction, or (3) misapplies the factual or legal conclusions when fashioning its injunctive relief. *Id*.

The district court issued an injunctive order that served to clarify and add to the injunction order issued on July 14, 2003. The September 17th injunction (1) permanently enjoined Singh from pursuing registration of the "Testmasters" or "Test Masters" marks in the PTO; (2) mandated that

---

[8] Singh also appeals from the district court's decision to deny his motion to amend his complaint to add additional claims. The grant or denial of a leave to amend is reviewed on appeal for abuse of discretion. *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. Nov. 1981). While it is true that Fed. R. Civ. P. 15(a) requires a trial court "to grant leave to amend 'freely,'" *id.*, we have also recognized that decisions concerning motions to amend are "entrusted to the sound discretion of the district court." *Quintanilla v. Tex. Television, Inc*., 139 F.3d 494, 499 (5th Cir. 1998). A court may deny a motion for leave to amend if there is undue delay, bad faith or dilatory motive, undue prejudice or futility of the amendment. *Dussouy*, 660 F.2d at 597. Upon independent review of the record, we find that the district court did not abuse its discretion in denying Singh's motion to amend. We therefore affirm the district court's ruling.

Singh withdraw his current application pending before the PTO, and permanently enjoined him from refiling such application, "unless this order is specifically reversed or withdrawn"; (3) permanently enjoined Singh from interfering with or opposing TES's registration of the "Testmasters" or "Test Masters" marks with the PTO; (4) permanently enjoined Singh from using the marks or any confusingly similar marks within Texas or directed at Texas, including but not limited to uses via the Internet; and (5) enjoined Singh from communicating directly with, threatening, or harassing Test Masters Educational Services, Inc., its employees, its staff, or TES's counsel, counsel's employees, or counsel's staff.

Singh asserts that the district court entered its order without findings of fact or conclusions of law in violation of Federal Rule of Civil Procedure 65(d) and Rule 52(a), which, he contends, requires this court to vacate the injunction on appeal. In issuing its order, the district court stated that Singh had "only made a half-hearted effort to comply with" the July 14, 2003 injunction order, and the court believed that Singh had only made an effort to comply after TES filed its motion for contempt. The district court also found that "Singh made an insincere effort to remedy the fact that he had applied for the mark and interfered with TES's registration of its mark by seeking a 'suspension' of his application, instead of withdrawing it entirely," also in violation of the court's prior judgment and the July14th injunction. Even though *Testmasters I* ordered the district court to enter an order that Singh's trademark is invalid, the court found that Singh continued to "use[] the registered mark on his website." The district court also found that Singh "allowed a TestMasters sign to be posted by the [Texas] Hilton," despite the court's order in the prior action that Singh refrain from using the TESTMASTERS mark in Texas because TES had the exclusive rights to the mark in Texas. The district court's injunction order was preceded by an extensive discussion detailing factual

23

allegations, asserted by TES, and describing evidence of harassment by Singh and Testmasters agents. These findings could support the district court's injunction order. Nonetheless, when the district court does not make any express findings of fact or conclusions of law supporting the injunction, as required by Federal Rule of Civil Procedure 65(d), its " failure to do so does not require that the injunction be reversed or vacated." *Prof'l Ass'n of College Educators, TSTA/NEA v. El Paso County*, 730 F.2d 258, 273 (5th Cir. 1984). It does call on us to examine the record to determine if sufficient evidence supports the issuance of injunctive relief. *Id.* (citation omitted); *White v. Carlucci*, 862 F.2d 1209, 1210-11 n.1 (5th Cir. 1989).

District courts can enter injunctions as a means to enforce prior judgments. *See Santopadre v. Pelican Homestead & Sav. Assoc.*, 937 F.2d 268 (5th Cir. 1991). In *Testmasters I*, we held that TES's motion for judgment as a matter of law should have been granted because Singh had not sustained his burden of proving secondary meaning. We also remanded the action to the district court for entry of an order that Singh's trademark is invalid. In order to enforce this court's prior judgment, it was within the district court's discretionary power to issue an injunction prohibiting Singh from pursuing registration of the "Testmasters" or "Test Masters" marks in the PTO, mandating that Singh withdraw his current application pending before the PTO, and enjoining him from refiling such application.[9] Singh defiantly re-applied for a federal trademark registration despite our holding two days earlier that his trademark was invalid. In addition, two years later, Singh has

---

[9] We join our sister circuit in rejecting Singh's argument that prohibiting him from registering a mark with the PTO violates his first amendment rights. *In re Mavety Media Group Ltd.*, 33 F.3d 1367, 1374 (Fed. Cir. 1994) (citing *In re McGinley*, 660 F.2d 481, 484 (U.C.C.P.A. 1981) ("With respect to appellant's First Amendment rights, it is clear that the PTO's refusal to register appellant's mark does not affect his right to use it. No conduct is proscribed, and no tangible form of expression is suppressed. Consequently, appellant's First Amendment rights would not be abridged by the refusal to register his mark.")).

not yet completely withdrawn his application pending before the PTO. The district court's injunction order thus served to effectuate this court's judgment in *Testmasters I*.[10]

The district court also enjoined Singh from interfering with or opposing TES's registration of the "Testmasters" or "Test Masters" marks with the PTO, and from using the marks or any confusingly similar marks within Texas or directed at Texas, including but not limited to uses via the Internet. At the conclusion of the jury trial in the prior action, the district court issued an order instructing the director of the PTO to modify Singh's trademark registration to confer in TES the exclusive right to use its mark within Texas. The order was issued in accordance with the jury's finding that TES was an innocent prior user of the TESTMASTERS mark in Texas. We did not reverse that order on appeal. Pursuant to the district court's order and the jury's findings in *Testmasters I*, TES may assert rights in the TESTMASTERS mark in the state of Texas. *Tex. Pig Stands*, 951 F.2d at 692-93 (citing *Sheila's Shine Prod., Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir. 1973) (holding that a state is an appropriate territory by which to define trade areas when two parties are competing over the right to use the same mark)). In order to enforce that prior judgment, the district court had the power to enjoin Singh from interfering with TES's registration of the mark for use within Texas, and to enjoin Singh from using similar marks within Texas. However, injunctions must be narrowly drawn and precise. *Brown v. Petrolite Corp.*, 965 F.2d 38, 51 (5th Cir. 1992). The prior action did not address the extent of TES's trademark rights outside of Texas and TES has established no rights to the mark outside of Texas. The district court's injunction

---

[10] It is not the case that Singh is enjoined from *ever* registering his "TESTMASTERS" mark again, which is made clear by the district court's caveat that Singh is enjoined from re-filing his current application with the PTO until the district court's order is reversed or withdrawn.

erred in not circumscribing its order to only enjoin Singh from opposing or interfering with TES's right to the mark within Texas.

Finally, the district court's injunction order enjoined Singh from communicating directly with, threatening, or harassing Test Masters Educational Services, Inc., its employees, its staff, or TES's counsel, counsel's employees, or counsel's staff. The district court's injunction was prompted by allegations from TES that Singh and his employees had called TES dozens of times a day, including seventy-one times on one day in May 2003. TES alleged that the calls included the screaming of obscenities. TES also claims that Singh's counsel, Sharon Naim, contacted TES's president, Roger Israni, and threatened to file suit against TES in other states. TES taped the phone conversation and offered it as evidence that Singh had Naim call Israni directly, which is against the rules of professional conduct for lawyers. TES avers that another person acting on behalf of Singh called the accounting department of TES's counsel, pretended to be a TES staff member, and obtained billing and insurance information about TES. TES also recorded a conversation with another of Singh's counsel who called TES offices in August 2003, pretending to be a student in order to gain information about TES. TES contends that it has a recording of that conversation. Finally, TES alleges that Singh sent a letter to TES's insurer, informing the insurer that it should not cover TES's costs should TES lose in court. In addition, TES's counsel and Singh did engage in a verbal and physical altercation in the hallway outside the district courtroom in California after TES's counsel accused Singh of verbally and physically threatening them. Singh denies threatening TES's counsel. The district court in California had to order the parties and their counsels to go straight from the courtroom to their cars and threatened them with jail time if another incident occurred.

26

Prior restraints are "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States,* 509 U.S. 544, 550 (1993). The district court's order enjoining Singh from having any future communication with the specified persons was a prior restraint. Any system of prior restraints on communication bears a heavy presumption against its constitutional validity. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (quotation marks omitted). Prior restraints are unconstitutional limitations on free speech except in exceptional circumstances. *Near v. Minnesota*, 283 U.S. 697, 716 (1931).

The district court prohibited Singh from "communicating directly with . . . TES employees, staff or TES's counsel, counsel's employees, or counsel's staff." To quote selectively from the district court, the court found that the parties had demonstrated an "immaturity" and "mean-spirited[ness]," and that Singh was pursuing "vexatious litigation." However, despite the perhaps need of these parties to never speak again, the court did not detail, and the record does not reflect, any "exceptional circumstances" to justify permanently enjoining Singh from generally communicating with TES, TES's counsel and their staff and employees. The district court's order enjoining Singh from communicating with TES employees, TES's counsel, and its counsel's employees was a prior restraint limiting Singh's first amendment rights, and because the injunction order is not supported by exceptional circumstances, it is an unconstitutional restraint on Singh's free speech rights. *See id.*

Courts have made a distinction between communication and harassment. *See, e.g.*, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949). The difference is one between free speech and conduct that may be proscribed. *See e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 389 (1992). Although restrictions based upon conduct may incidentally restrict speech, the courts have found that

27

such a restriction poses only a minimal burden on speech. *See, e.g.*, *id.*; *see also Gormley v. Director*, 632 F.2d 928, 941-42 (2d Cir. 1980); *Thorne v. Bailey*, 846 F.2d 241, 243 (4th Cir. 1988). Thus, courts do have the power to enjoin harassing communication. *Lewis v. S. S. Baune,* 534 F.2d 1115, 1122 (5th Cir. 1976) (citations omitted). Courts also have the power to enjoin repeated invasions of privacy. *Id.* The cantankerous relationship between these parties is clearly evident from the record in this case. There is enough evidence presented in the record to justify an injunction order prohibiting Singh from threatening or harassing TES, its employees, its staff, TES's counsel, counsel's employees, or counsel's staff. However, the injunction here went beyond enjoining harassing and threatening conduct. The district court's order swept too broadly when it prohibited all communication between Singh and TES employees, staff or TES's counsel, counsel's employees or counsel's staff. We do not read the district court's order as an absolute bar to legitimate communications through the parties' counsels and we leave to the district court on remand to delineate the parameters of such communication.

For the foregoing reasons, we vacate the district court's injunction order insofar as it enjoins Singh from opposing or interfering with TES's contention that it has rights to the TESTMASTERS mark outside of the state of Texas, and insofar as the order enjoins Singh from engaging in any communications with TES, its counsel, and their employees. We remand this case back to the district court with instructions to modify the injunction consistent with this opinion.

C.    The Parties' Remaining Claims

The remaining claims are: TES's appeal from the district court's denial of its motion to hold Singh in contempt and motion for sanctions; Singh's motion to strike Judge Gilmore's language in

the injunction order; and Singh's request for a remand with orders from us to assign this case to a different judge.

Singh takes issue with the district court's statement that, "Defendant Robin Singh's filing of numerous actions across the country, while arguably based on different facts and involving different parties, seems to this Court to be a part of Mr. Singh's campaign of terror." Singh complained that the "campaign of terror" phrase in essence labeled him a terrorist, to which he is particularly sensitive because he is Sikh. In a later order denying Singh's motion to reconsider and/or modify the September 17, 2004 contempt order, the district court clarified its "campaign of terror" statement by referring to Webster's dictionary definition of terror, "one that [is] annoying or difficult to manage, esp. a child : NUISANCE." Singh also objects to the district court's statem ent that "the courts should not have to be a part of such obviously vexatious litigation." Singh contends that the district court's statements demonstrated prejudgment concerning the merits of, and motivations for, the legal positions he puts forth. Singh also asserts that the order is harmful to his reputation and livelihood because it was forwarded to other courts in which he is adjudicating similar claims. *See supra*, n. 1.

Courts of appeals have the authority to remand a case back to the district courts with instructions to assign the case to a different judge. *In re DaimlerChrysler Corp.*, 294 F.3d 697, 700 (5th Cir. 2002). However, it is an "extraordinary" power that should be rarely exercised. *Id*.

"[J]udicial rulings alone almost never constitute a valid basis" for finding bias or partiality. *Litkey v. United States*, 510 U.S. 540, 555 (1994) (citation omitted). The Supreme Court has held that judicial rulings, in and of themselves, "can only in the rarest circumstances evidence the degree of favoritism or antagonism required" to warrant recusal. *Id.* Moreover, the

> opinions formed by the judge on the basis of facts introduced or events occurring in
> the course of the current proceedings, or of prior proceedings, do not constitute a

29

basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Id.* The Court went on to affirm that "expressions of impatience, dissatisfaction, annoyance, and even anger, [] are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration--even a stern and short-tempered judge's ordinary efforts at courtroom administration--remain immune." *Id.* at 555-56.

In reviewing the substantial record that has accumulated over the course of these parties' long litigious relationship, it is easy to see how any district court might become exasperated with both parties. But, we find nothing in the record that would lead an objective person to view Judge Gilmore's conduct as giving rise to the appearance of impropriety, requiring the assignment of a different judge, nor do we find that the isolated comments cited by Singh require being stricken from the district court's order.

While Singh complains that Judge Gilmore was too harsh towards him, TES argues that Judge Gilmore usurped her responsibilities by not being harsh enough. TES claims that the district court erred in denying its motion to hold Singh in contempt and motion for sanctions. TES contends that Singh has interfered with its ability to try to register the "Test Masters" mark with the PTO, in violation of the July 14, 2003 injunction, because TES cannot proceed in the PTO until Singh's application is withdrawn. TES also maintains that when Singh held classes at the University of Houston Hilton it advertised itself as "Testmasters," and Singh continues to advertise as "Testmasters" on specific webpages targeted at law schools in Texas–both actions violate the injunction order. As evidence of Singh's violation of the court order, TES offered the declaration

of a private investigator, who provided photos of the Testmasters sign at the University of Houston Hilton and a handwritten note from the instructor that had Singh's testmaster180.com website address.

A district court's refusal to hold a party in civil contempt is reviewed under the abuse of discretion standard. *Neely v. City of Grenada*, 799 F.2d 203, 207 (5th Cir. 1986). "A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992); *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 383 (5th Cir. 1999) (citation omitted). The evidence must be "'so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts' of the case." *Piggly Wiggly*, 177 F.3d at 383 (citation omitted).

Upon a finding of contempt, the district court has broad discretion in assessing sanctions to protect the sanctity of its decrees and the legal process. *See Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 585 (5th Cir.2000). A district court's imposition or denial of sanctions is reviewed under the abuse of discretion standard. *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 548-49 (5th Cir. 2001).

We have reviewed the record, the parties' arguments, and the district court's order in this case, and we do not find that the district court abused its discretion in refusing to hold Singh in contempt or in refusing to impose sanctions. Singh presented numerous documents and affidavits to defend his actions as either honest mistakes or outside the bounds of the injunction order. Although, the district court expressed doubts about the sincerity of Singh's compliance with the injunction

31

order, the court was not moved by clear and convincing evidence and did not find Singh's behavior contemptuous. We do not find the district court's view of the evidence to be clearly erroneous. "The imposition or denial of sanctions of necessity involves a fact-intensive inquiry into the circumstances surrounding the activity that is the subject of sanctions." *Thomas v. Capital Sec. Serv., Inc.*, 836 F.2d 866, 873 (5th Cir. 1988). "The trial judge is in the best position to review the factual circumstances and render an informed judgment as he is intimately involved with the case, the litigants, and the attorneys on a daily basis." *Id.* "We can perceive of no advantage that would result if this Court were to conduct a second-hand review of the facts from the trial court level, as 'the district court will have a better grasp of what is acceptable trial-level practice among litigating members of the bar than will appellate judges.'" *Id.* (citation omitted). We therefore affirm the district court's denial of TES's motion to hold Singh in contempt and motion for sanctions.

After the case was submitted to the panel, both TES and Singh filed motions to supplement the record. Both parties' motions are denied.

### III. CONCLUSION

For the foregoing reasons, we VACATE the district court's injunction order insofar as it enjoins Singh from opposing TES's assertion that it has rights to the TESTMASTERS mark outside of the state of Texas, and insofar as the order enjoins Singh from engaging in any communications with TES, its counsel and their staff. We REMAND this case back to the district court with instructions to modify the injunction consistent with this opinion. The district court's grant of TES's motion to dismiss, and the denial of TES's motion to hold Singh in contempt, and for sanctions, is AFFIRMED.

AFFIRMED in part, VACATED in part, and REMANDED.